CITIZENS FOR SAFE POWER, INC., and Audubon Naturalist Council, Petitioners,

v.

NUCLEAR REGULATORY COMMISSION, Respondent,

Maine Yankee Atomic Power Company, Intervenor.

No. 74–1186.

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 1975.

Decided Dec. 22, 1975.

Harold P. Green, Washington, D. C., for petitioners.

James A. Glasgow, Atty., U. S. Nuclear Regulatory Commission, with whom Wallace H. Johnson, Asst. Atty. Gen., Marcus A. Rowden, Gen. Counsel, Jerome Nelson, Sol., U. S. Nuclear Regulatory Commission, Edmund B. Clark and Neil T. Proto, Atty., Dept. of Justice, were on the brief for respondent. Jacques B. Gelin, Atty., Dept. of Justice, and Leon Silverstrum, Atty., U. S. Nuclear Regulatory Commission also entered appearances for respondent.

Thomas G. Dignan, Jr., Boston, Mass., for intervenor.

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and CHRISTENSEN,* Senior District Judge for the District of Utah.

CHRISTENSEN, District Judge.

Petitioners seek review of a final decision and order of the Atomic Safety and Licensing Appeal Board of the Atomic Energy Commission (AEC)[1] (now the Nuclear Regulatory Commission, 42 U.S.C. § 5841(f)) affirming issuance of an operating license to Maine Yankee Atomic Power Company (Maine Yankee) for a constructed commercial power reactor near Wiscasset, Maine.

Petitioners contend that failure of AEC to make findings required by the Atomic Energy Act of 1954 (AEA)[2] and to compile an evidentiary record sufficient to support such findings, together with its failure to comply with the National Environmental Policy Act of 1969 (NEPA),[3] would justify the issuance of an order by this court suspending the operating license. "In view of the asserted need for electrical power produced by the . . . facility", however, petitioners ask only that AEC be ordered to reopen the proceedings for the purpose of receiving additional evidence allegedly necessary for proper consideration of AEA requirements, and for the preparation of an "adequate" Final Environmental Impact Statement, and that in the meantime the court order an amendment of the license to restrict operation to 75% of full power.

In keeping with the two-step licensing procedure directed by the statute[4] the

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d)

1. The rules of the Commission make a dispositive order of the Appeal Board the "final decision" of the Commission for the purposes of judicial review. The petition for review specified a decision of the Appeal Board dated November 30, 1973. In January, 1974, the AEC remanded the matter *sua sponte* "for further elaboration of the Appeal Board's cost-benefit reasoning with respect to the residual risks . . . .." The Appeal Board reaffirmed upon further discussion and conclusion that its prior analysis of the controlling factors had been correct. It is unnecessary to further detail these proceedings since no question is raised concerning the timeliness of the instant petition nor as to the finality of the decision it attacks.

2. Pub.L. 83–703, 68 Stat. 919, as amended 42 U.S.C. § 2011 *et seq.*

3. Pub.L. 91–190, 83 Stat. 852, 42 U.S.C. § 4321 *et seq.*

4. 42 U.S.C. §§ 2232, 2235.
   Section 2232 provides in relevant part:
   "*License applications.—*

   "a. Each applicant for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary to decide such of the technical and financial qualifications of the applicant, the character of the applicant, the citizenship of the applicant, or any other qualifications of the applicant as the Commission may deem appropriate for the license. In connection with applications for licenses to operate production or utilization facilities, the applicant shall state such technical specifications, including information of the amount, kind, and source of special nuclear material required, the place of the use, the specific characteristics of the facility, and such

AEC on October 21, 1968, issued to intervenor a permit to construct the Maine Yankee Atomic Power Station (MYAPS), and on May 12, 1971, published notice of consideration of issuance of a license to operate the facility. Petitioners and the State of Maine were granted leave to intervene. Issues pertaining to questions of radiological health and safety arising under provisions of the AEA and environmental issues under the NEPA were scheduled for consideration in separate hearings. During the course of these hearings the parties entered into stipulations relating to the subject matters of the hearings.

Following the hearing July 5 and 6 relating to the radiological and safety issues, Maine Yankee moved unopposed for an interim license to operate its facility for a period of 18 months at a level of 75% of full power, and such license was issued. An evidentiary hearing regarding NEPA issues was conducted on September 14 and 15, 1972, following which a license to operate the facility for a term of 40 years at full power (2440 megawatts thermal) was issued by AEC. Exceptions to this decision were filed with the Atomic Safety and Licensing Appeal Board and it on November 30, 1973, affirmed the initial decision with certain modifications not material here. Nor is it deemed significant on this appeal that the Board also noted that while the agency's Environmental Impact Statement (EIS) complied with NEPA, the radiological stipulation entered into by the parties refined certain portions of it and that a corresponding modification should be deemed included in the statement.[5]

■ From the more diffusive issues tendered in petitioners' initial brief,[6] has

---

other information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public. Such technical specifications shall be a part of any license issued. . . ."

Section 2235 provides:

"Construction permits.—All applicants for licenses to construct or modify production or utilization facilities shall, if the application is otherwise acceptable to the Commission, be initially granted a construction permit. The construction permit shall state the earliest and latest dates for the completion of the construction or modification. Unless the construction or modification of the facility is completed by the completion date, the construction permit shall expire, and all rights thereunder be forfeited, unless upon good cause shown, the Commission extends the completion date. Upon the completion of the construction or modification of the facility, upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this chapter and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this chapter, the Commission shall thereupon issue a license to the appli-

cant. For all other purposes of this chapter, a construction permit is deemed to be a 'license.' "

See also *Power Reactor Co. v. Electricians,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

5. The additional material was published in the Federal Register as part of the Board's decision. There was compliance with the additional requirement that the EIS, as modified, shall be transmitted to the Council on Environmental Quality and made available to the President. Not questioning the importance of full disclosure and the necessity of real opportunity for public input under NEPA, we believe in the circumstances that there was no departure from either the letter or spirit of the Act. Petitioners' argument that if the modification had been included in the publication of the initial statement public input might have been increased is overdrawn and speculative. See *Environmental Defense Fund v. Froehlke,* 368 F.Supp. 231 (W.D.Mo.1973), *aff'd,* 497 F.2d 1340 (8th Cir. 1974).

6. "1. May the Atomic Energy Commission issue a license for operation of a nuclear power plant, in the face of uncontroverted evidence that operation will endanger the health and safety of the public, solely on the basis of its finding that operation of the facility will be in conformity with statutory requirements and the Commission's regulations without any assessment or consideration of the magnitude or acceptability of the risk?

"2. Did the Commission properly find that issuance of the license would not be inimical

emerged the decisive point: Whether the AEA and Commission regulations under it require the discreetly formalized weighing of residual risks and benefits by the Commission with specific reference to AEA requirements, where ultimate findings satisfying the latter requirements were separately made, the facility fully complies, and in operation will comply, with the unchallenged safety and health regulations promulgated pursuant to the Act and the risks and benefits were explicitly weighed by the Commission prior to the decision under attack in the NEPA in review of an adequate EIS.[7] We answer this question in the negative and affirm, noting that the other tendered issues present problems of little substance in view of the record before us.

Although we have determined that there can be no substantial question of the sufficiency of the proof to support the Commission's decision, it will be helpful to refer briefly to the nature of the evidence before dealing with the problem of findings.

In addition to oral testimony, and the stipulations hereinafter mentioned, there was before the Commission on the health and safety issues substantial documentary evidence. The latter included Maine Yankee's license application and its summary, correspondence between Maine Yankee and the regulating staff, the Staff's Safety Evaluation Report, a letter from the Advisory Committee on Reactor Safeguards addressed to the Chairman of the Commission discussing the safety of the facility, and Maine Yankee's Final Safety Analysis Report, with amendments. The "radiological" stipulation entered into between the parties contained statements of numerous additional facts, conclusions and opinions dealing with health and safety which were agreed by the parties to be true for the purposes of the proceeding. The facts, but not the opinions and conclusions, contained in the documentary evidence were stipulated to be true and correct subject to the controlling effect of the stipulation. Among other agreed facts and conclusions of this stipulation, subject only to the reservation that it was not agreed "that operation of MYAPS can be conducted without endangering the health and safety of the public or will not be inimical to the health and safety of the public" were these:

"[T]hat MYAPS has been substantially completed, in conformity with the construction permit and the application, as amended, the provisions of the Atomic Energy Act of 1954, as amended, and the Rules and Regulations of the Commission . . . that MYAPS will operate in conformity with the application, as amended, the provisions of the Atomic Energy Act of 1954, as amended, and the

---

to, and that there was reasonable assurance that activities under the license could be conducted without endangering, the health and safety of the public?

"3. Did the Commission discharge its affirmative obligation to develop an evidentiary record supporting issuance of the operating license?

"4. Did the Commission's final decision meet the requirement for principled decisionmaking as enunciated by this Court?

"5. Did the Commission's Final Environmental Statement meet the requirements of the National Environmental Policy Act?"

**7.** This is based substantially upon the statement of the controlling issue contained in respondents' brief, and intervenor's "Issue 2". Petitioners moved toward such simplification when they responded in their reply brief:

"The central issue in this case is not whether operation of the Maine Yankee plant will be adequately safe. The Petitioners recognize that the question whether the risks of operation are acceptable is one entrusted by statute to the AEC. Rather, the central issue is whether the AEC has concluded that the risks are acceptable in accordance with the requirements prescribed in the Atomic Energy Act and its own rules and regulations. . . . "

"Since the Petitioners conceded in the radiological stipulation that the plant had been constructed and would be operated in conformity with the Act and the AEC's rules, the core of the Petitioners' position before this Court is that the 'reasonable assurance' and 'not inimical' determinations were not made in the proper manner."

Rules and Regulations of the Commission . . . that there is reasonable assurance that the activities sought to be authorized in this proceeding will be conducted in compliance with the regulations set forth in Title 10, Chapter 1 of the Code of Federal Regulations."

It was also agreed *inter alia*, that during normal operations Maine Yankee will discharge into the air gaseous releases, and into Montsweag Bay liquid effluents, containing low-level radioactive material, which will be a small fraction of the quantities presently permitted under CFR 20 [8] and a small fraction of the radiation exposure resulting to individuals from natural background; that no adverse effects on humans or animals have ever, as yet, been demonstrated to occur as a result of radiation levels which are many times higher than those which will result from the radioactive discharges expected to be made from MYAPS during normal operation, although it has not been proven that this discharge of the radioactive materials is completely without any risk to the health and safety of the public or to the environment generally; that the Environmental Protection Agency estimates that exposure of the average American citizen to sources of radiation such as natural background nuclear power plants and other atomic energy facilities, x-rays, weapons testing, various consumer products and fallout was approximately 200 millirems per year in 1970; that two hundred millirems per year is many times the estimated exposure from MYAPS which an individual would receive from radiation expected to be discharged in normal operation if he were to spend an entire year at the site boundary; beyond that point, the exposure to any individual due to the plant would decrease rapidly as the distance from the plant increased; that there is no explicit experimental scientific evidence that exposure to radiation levels permitted under the regulations of the Atomic Energy Commission will have any adverse somatic effect whatsoever, nor has it been scientifically demonstrated that such exposure will not have adverse somatic effects; that if an individual were to spend a year at the site boundary of MYAPS, the dose he would receive approximates the radiation dosage that he would receive in one round trip in a jet airliner between New York and Los Angeles; that in considering the significance of the fact that there is no scientific evidence that radiation exposures within the limits of the AEC's regulations are harmful, it should be noted that man-made radiation has been released into the environment for less than half a century and it may take a very long period of time for adverse effects to become apparent; that the AEC's radiation protection standards reflect a judgment that activities to which these standards are applicable are sufficiently beneficial to warrant imposition of what the AEC regards as extremely small risks on the public; that based upon present knowledge, while the radioactive discharges from MYAPS during normal operation may involve some risk as a result of exposure to radiation, the risk involved is not substantial; that Maine

---

**8.** Part 20 of Title 10, Chapter 1, CFR establishes standards for protection against radiation hazards arising out of activities under licenses issued by AEC. As described in *Crowther v. Seaborg*, 312 F.Supp. 1205, 1231 (D.Colo. 1970):

"Radiation protection standards are established by the various agencies through a complex process. This process entails the review and evaluation of studies of the biological effects of radiation. These studies attempt to ascertain the risk to humans from radiation exposure. The agencies also study the utilization of radioactive processes and materials in order to establish the benefits to be derived from radiation exposure. The setting of exposure standards at a given level requires the weighing of these risks and benefits to be derived therefrom. The weighing requires a value judgment as well as a measuring, and thus the standards are not scientific numbers below which no danger exists. The value judgment embodies complex social and political considerations, for atomic energy has a potential that suggests unlimited benefits to entire nations and presents a risk to entire populations of people, and perhaps their progeny."

Yankee must conduct a continuing program of studies to ascertain the radiological effects, if any, of the operations of MYAPS in the vicinity of the plant and must take corrective action if required by the AEC; that the present design of MYAPS is expected to reduce the risks presumed to be incident at the upper limits of the exposures presently permitted by the Atomic Energy Commission by more than 90%, and that the discharges from MYAPS appear to be as low as practicably achievable taking into account the state of technology, and the economics of improvements in relation to benefits to the public health and safety and in relation to the utilization of atomic energy in the public interest.

A second stipulation was entered into by the parties now before the court with respect to issues arising under NEPA. To the extent now relevant this stipulation provided for admission into evidence of the AEC's EIS, stated that the opinions and conclusions expressed therein were those of qualified persons, and defined the only contested environmental issues as being whether the EIS complied with the requirements of Section 102(2)(c) of NEPA and adequately described appropriate alternatives as requested by Section 102(2)(D) of NEPA, and whether any additional conditions should be imposed in any license issued to Maine Yankee. It was also agreed that the prior stipulation with respect to radiological health and safety issues would be controlling in the event of any inconsistency between the two stipulations.

■■■ The evidence was not insufficient because it did not go beyond present technology to further define or speculate concerning the indefinable.[9] There is no suggestion that there were available facts of significance going beyond those reflected in the record. The Commission had before it adequate information to demonstrate not only that approval of the operating license would meet technical and public policy standards engrained in its basic regulations but to permit its consideration and determination whether special circumstances pertained to the particular facility which might render these standards inadequate to afford reasonable assurances concerning public health and safety. Absolute or perfect assurances are not required by AEA, and neither present technology nor public policy admit of such a standard. It was for the Commission to arrive at a rational, practical and principled conclusion upon the basis of reasonably available evidence.[10]

■■■ We return to the crucial problem of findings. The petitioners initially contended here that since the AEA contemplates "that risks will be inherent in the operation of a nuclear power facility even though operation will be in full conformity with the Commission's regulations . . . specific findings as to the acceptability of these risks [are required]." The findings of the Commission did not need to recite verbatim and by rote the facts stipulated by the parties, even though independent evidence supplemented them to permit the stipulations to be looked to in evaluating the ultimate findings made. And, considering the proceedings as a whole, there were express findings made by the Commission on each requirement and the related acceptability of the project.[11]

9. "An agency cannot be required to 'foresee the unforseeable'". *Union of Concerned Scientists v. Atomic Energy Commission*, 163 U.S.App.D.C. 64, 499 F.2d 1069, citing *Scientists' Institute for Public Information, Inc. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973).

10. See *Power Reactor Co. v. Electricians*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), *supra; Nader v. Ray*, 363 F.Supp. 946 (D.D.C. 1973).

11. It is true that in connection with its discussion of health and safety issues under the AEA the Licensing Board declined to "balance whatever risks that are inherent in the operation of *any* [emphasis added] nuclear power plant . . . however small they may be . . . 'however insignificant they may be' . . . beyond the requirements and scope of the Commission's Criteria and Regulations." It added: "To do what the Joint Intervenors [petitioners] request would be to place this

Hence it is understandable that petitioners' attack upon the Commission's findings has been narrowed to assert only that "the petitioners' final position before this court is that the 'reasonable assurance' and 'not inimical' determinations were not made in the proper manner."

Commission regulations, interpreting and applying AEA, provide among other things, that an operating license may be issued by the Commission upon finding that there is reasonable assurance that the activities authorized by the operating license can be conducted without endangering the health and safety of the public, and that the issuance of the license will not be inimical to the common defense and security or to the health and safety of the public.[12] During oral argument petitioners contended that such findings had to be made "independent of the Commission's health and safety regulations"[13] and, inferentially, independent of the consideration of NEPA issues.

Board in the position of second guessing the actions of the Congress in promulgating the Atomic Energy Act, and of the Commission in issuing implementing regulations establishing parameters under the Act. To modify the Criteria and Regulations the Commission, the Joint Intervenors must proceed in accordance with 10 CFR § 2.758 or 10 CFR § 2.802." In connection with a discussion of NEPA issues, the Licensing Board did balance risks against benefits and specifically discussed and rejected alternates. And on the whole case it concluded, among other things that [there is reasonable assurance] (i) that the activities . . . can be conducted without endangering the health and safety of the public . . . [and] the license will not be inimical . . . to the health and safety of the public."

The Atomic Safety and Licensing Appeal Board in the final decision constituting the basis of the petition for review discussed the safety issues in detail and observed, *inter alia*: "While a number of paragraphs in the stipulation on health and safety raise opposite and sometimes contradictory viewpoints of what can be characterized as fundamental issues of nuclear industrial safety, the board is convinced by the clear preponderance of the evidence in the record that the operation of MYAPS will not be inimical to the public's health and safety. On the basis of the foregoing, the board finds that issuance of the operating license for MYAPS will not be inimical to the public health and safety."

12.· Both Section 185 of the Act (42 U.S.C. § 2235) and 10 CFR § 50.57(a)(1)(2) require findings that the facility has been constructed and will operate in conformity with the provisions of the Act and of the Commission's rules and regulations. Section 104(d) (42 U.S.C. § 2134(d) ), applicable by reason of Section 102(b) (42 U.S.C. § 2132(b) ) and 10 CFR § 50.-57(a)(6), require a finding that issuance of the license will not be inimical to the health and safety of the public. The Commission's rules (10 CFR § 50.57(a)(3)(i) ), require a finding of reasonable assurance that activities authorized by the license can be conducted without endangering the health and safety of the public. Although there is no explicit requirement in the Act for the latter determination, its Section 182(a) requires license application to contain information that will enable the Commission to determine that there will be "adequate protection to the health and safety of the public." We have no occasion here to examine possible differences between the two tests. The parties do not substantially differentiate and, while the Licensing Board inferred some distinction, the Appeal Board stated they were inextricably interwoven and treated them as being the same.

13. Petitioners' reply brief is equivocal in this point. After asserting that such an interpretation of their positions was misinterpreted by respondent and intervenor, they state (p. 7):

"The AEC argues that, a determination having been made in the NEPA phase of the proceeding that benefits outweigh the risks, this meets what the AEC says is the Petitioners' demand for a risk-benefit determination under the 'reasonable assurance' and 'not inimical' tests. Moving from a 'crabbed interpretation of NEPA [that] makes a mockery of that Act' (*Calvert Cliffs Coordinating Committee v. AEC*, 146 U.S.App.D.C. 33, 41, 449 F.2d 1109, 1117 (1971), the AEC now hides behind NEPA. The argument is, however, without merit.

"First the AEC's theory is an after-the-fact invention to rationalize its tenuous position. The fact of the matter is that the Commission has always regarded the radiological health and safety and the environmental phases of licensing proceedings as totally separate and distinct. Petitioners are aware of no other cases in which the Commission has imputed findings on NEPA issues to the findings required under the Atomic Energy Act . . . . . Second, in order for the Commission's findings on acceptability of risk in the NEPA phase to be regarded as equivalent to, and an adequate substitute for, the 'reasonable assurance' and 'not inimical' determinations required under the Atomic Energy Act, it is necessary that the determination in fact be equivalent. . . . ."

The Atomic Energy Act was passed years before broader environmental concerns prompted enactment of the Environmental Protection Policy Act. Yet many of those same concerns permeated provisions of the first-mentioned legislation and the regulations promulgated in accordance with its mandate. To say that these must be regarded independently of the constantly increasing consciousness of environmental risks reflected in proceedings with reference to NEPA, would make for neither practicality nor sense. Nor can AEA requirements be viewed separate and apart from NEPA considerations.

Especially in view of NEPA, it also is unreasonable to suppose that risks are automatically acceptable, and may be imposed upon the public by virtue of AEA, merely because operation of a facility will conform to the Commission's basic health and safety standards. The weighing of risks against benefits in view of the circumstances of particular projects is required by NEPA in view of AEA. The two statutes and the regulations promulgated under each must be viewed in *para materia*. A basic flaw in petitioners' contentions is that while they recognize the importation into AEA and its regulations of the *ad hoc* risk-benefit weighing requirements of NEPA beyond the Commission's basic regulations, they would demand that the process be accomplished independently of NEPA despite the clear applicability of the latter.

Apart from the requirements of NEPA or similar ones already implicit under AEA, it would be pointless, and a waste of agency resources, to require the AEC to reapply efforts that have already gone into its basic health and safety regulations, in individual licensing proceeding, in the absence of some evidence that a particular facility presents risks outside the parameters of the original rule making. And in evaluating the sufficiency of agency determinations in particular cases it would be stultifying formalism to disregard the whole record and test AEA compliance by only the evidence received at so-called "health and safety" hearings; or NEPA compliance only on the basis of so-called "environmental" hearings.

The Licensing Board made the "reasonable assurance" and "not inimical" findings, as described by the Appeal Board on " . . . the dual basis that the evidence demonstrated that the reactor would comply with applicable Commission regulations and that, in this instance, the Joint Intervenors [petitioners] had not shown that the regulations were inadequate to protect the public health and safety." In affirming these findings the Appeal Board stated: " . . . [W]e can and do hold that the demonstration of compliance with the regulations entitled the Board below to find adequate protection to the health and safety of the public or, as expressed in Section 50.57(a)(3)(i), reasonable assurances that the facility will be operated without endangering such health and safety. The stipulated risks could be dismissed in making that finding on the basis that there has been an implicit Commission judgment that these risks are sufficiently low as not to represent a meaningful health and safety threat."

Looking wholly to such language, petitioners interpret the Commission's view as being that any facility meeting the requirements of the rules may be licensed because, *a fortiori,* what meets these requirements automatically satisfies the "reasonable assurance" and "not inimical" tests. We do not so consider it, but rather that in the absence of some indication or showing on a case-by-case basis to the contrary, and subject to the weighing of risks—benefits under NEPA, it may be found that facilities complying with the rule do so. Under these circumstances, compliance with the mass of health and safety regulations with which the reactor conforms has a significance of its own. As the Supreme Court noted, the Atomic Energy Act "clearly contemplates that the Commission shall by regulation set forth what the public safety requires as a prerequisite to the issuance of any license or

permit under the Act." *Power Reactor Development Co. v. Industrial Union,* 367 U.S. 396, 404, 81 S.Ct. 1529, 1533, 6 L.Ed.2d 924 (1961). Yet we do not agree with respondents' suggestion that petitioners' attack is solely against Commission regulations and that any remedy is necessarily limited to rule-making or amending procedures. Given the intendments that properly can be entertained as a result of the rule-making, conclusions of the agency may be sustained without independent and complete reevaluations of the risks anew as this and each new case comes along. Having failed to resort to procedural avenues to test the radiological safety standards incorporated into the regulations, petitioners were foreclosed from attacking them here,[14] although not from showing, if they could, that whatever residual risks there were within regulation parameters should yet be deemed unacceptable in view of the absence of justification for their being taken in view of special circumstances. In the absence of such showing, the public policy implanted in the regulations, findings making all required AEA determinations in primary reliance upon compliance with the regulations, but also meeting the stringent requirements of NEPA, were sufficient.

Perhaps the Licensing Board has excessively divided for mere management purposes "radiological" and "environmental phases" of licensing proceedings into a semblance of substantive separation; but the full record discloses no serious dichotomy nor insufficiency. As the Appeal Board stated:

"[T]he NEPA review itself compels a weighing of the residual risks against the benefits. In this context, a dispute as to whether another statute (The Atomic Energy Act) also triggers that weighing process is purely academic. The real question turns not upon a choice of statutory labels but upon the requisite weighing of the residual risks at some point of the licensing process."

The Appeal Board, citing NEPA regulations, recognized that "a weighing of the residual risks against the benefits" of the reactor is appropriate under NEPA. The Appeal Board performed that very process, factoring the stipulated residual radiation risks into the environmental analysis and concluding that they would not tip the balance against operation of the plant. It concluded that the Final Environmental statement (the facts recited which were stipulated to be true as noted):

"   .   .   .   adequately documents an established need for power in the area to be served by this facility. Given the dimensions of this need, it seemed manifest that the benefits that would inure from the operation of the facility outweighed the concern that, e. g., the extremely small increment to natural background radiation to be contributed by plant operation might at some future time be found to have greater environmental impact than now anticipated. [Footnote omitted.]"

■ In sum, the Commission found with abundant support in the record, that there was need for power to be generated by the project and that, in view of the dimensions of that need, the benefits outweighed the possibility that the small increment to background radiation, clearly acceptable under existing conditions, might at some future time be found to have greater environmental impact than the presently available studies indicate will be the case. If such speculative possibilities, which might run also in the opposite direction, were effective against the judgment of the agency to require a remand under the circumstances of this case, this would seem in ultimate effect to mandate rejection of the project itself; there is no indication that either possibility could be rendered other than speculative during the foreseeable future. And if this objection were so acted upon, consistency would require that all similar projects would have to be disapproved until, if ever, the ultimate,

14. See *Nader v. Nuclear Regulatory Commission,* 168 U.S.App.D.C. 255, 513 F.2d 1045 (1975).

although likely insubstantial effects, could be nicely weighed.[15]

■ We consider as without merit petitioners' additional or supplemental contention that the Commission's findings do not comport with the "principled" administrative decision making which this court has insisted upon.[16] Petitioners argue that the Commission was required to deal with the risks explicitly by way of identification, assessment of significance, and explanation of why it was issuing the license in the face of such risks. Aside from the fact that the actual balancing and weighing of risk and benefits was dealt with principally in findings directed to the environmental issues this is what the Commission through its agencies did, and did reasonably well in satisfaction of procedural as well as substantive requirements of both Acts. Neither

requires duplicative findings any more than it does duplicative hearings.[17]

■ The specific complaint is that there was no discussion in the EIS or by the Licensing Board of the issuance of an operating license for less than the maximum of forty years permitted by the law or for less than full rated power as alternatives, to the full-power, full-term licensing approved by the Commission. To the extent our intervening decisions of *Union of Concerned Scientists v. Atomic Energy Commission,* 163 U.S. App.D.C. 64, 499 F.2d 1069 (1974), cf. *Nader v. Nuclear Regulatory Commission,* 168 U.S.App.D.C. 255, 513 F.2d 1045 (1975), has lent color to such arguments, the reasoning of the Appeal Board constituted a principled decision on the point which should prevail under the circumstances of the case.[18]

---

15. It is important both to the credibility of the Act and our economic survival that the "grand congressional purposes underlying NEPA" are to be made and kept real, *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 17 A.L.R.Fed. 1 (1971); but mere argument alone must not be permitted against the principled judgment of agencies charged with the protection of the public interest to bring essential economic development to a standstill by magnification of slight possibilities into the horror of impending doom. See Boettner, "Techniques for Winning a Pollution Case, 21 Practical Lawyer, No. 4, 51 (June, 1975), at 52: "In preparing your case, anticipate the questions of the court and be ready to answer them in a graphic fashion. While opposing viewpoints should not be 'over-killed', it is desirable to maintain throughout the proceedings a certain sense of horror, which can be intensified through proper juxtaposition of arguments and witnesses. . . . "

16. See, *e. g., Environmental Defense Fund v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584 (1971); *Wellford v. Ruckelshaus,* 142 U.S. App.D.C. 88, 439 F.2d 598 (1971), and *Environmental Defense Fund v. Environmental Protection Agency,* 150 U.S.App.D.C. 348, 465 F.2d 528 (1972).

17. Cf. *Calvert Cliffs Coordinating Committee v. Atomic Energy Commission, supra,* at 1128 of 449 F.2d 1128.

18. The Appeal Board discussed the reasoning of the initial decision concerning alternatives and added:

"C. Finally, the Joint Intervenors [petitioners here] challenge the failure of the FES and the Licensing Board to deal with two alternatives to the issuance of a full-term, full-power operating license: the granting of a license for less than full-rated power or for a shorter term than 40 years. While recognizing that a 'rule of reason' is applicable to the consideration of alternatives, the Joint Intervenors would permit the exclusion only of alternatives which 'are not readily identifiable' or which are 'remote or speculative'. They characterize the alternatives of a license for less than the full term, or for less than full power, as 'obvious, immediate, and totally within the range of practicability', and they assert that NEPA requires their consideration.

"1. There are always, of course, an infinite number of possible alternatives to the full-term, full-power licensing of a nuclear power facility. If the 'rule of reason' applicable to impact statements is to be accorded any significance, it must be concluded that there is no absolute requirement that every conceivable alternative be explicitly addressed in each FES. Rather, it is sufficient that the FES focus upon those alternatives which there is reason to believe might, if adopted provide a significant difference in environmental impact.

"The Joint Intervenors assert in their brief to us that operation at below full-rated power would 'clearly reduce environmental costs'. We are not told, however, at what power level and by how much. Moreover, we can find nothing in the record to suggest that any particular dimunition in the power rating of the facility would result in a meaningful environmental saving. Plant construction—the source

The petition for review is denied.

BAZELON, Chief Judge (concurring):

I am in general agreement with the result reached by the Court, and concur in much of its opinion. But I am anxious that we not endorse the notion that a generating station's conformance to pre-existing AEC (now NRC) rules and regulations is a sufficient basis for findings of acceptability as to "health and safety" issues in the absence of evidence of special risk or harm.[1] Were I not convinced that the instant findings were properly grounded in other aspects of the proceeding, I could not approve application of the rule. Similarly, I am troubled by the Court's suggestion that less than full-term licensing need not be considered here because an incorporated license condition requires the licensee to take corrective steps if "certain significant and adverse effects are shown."[2] In the first instance, licenses may be routinely granted without independent examination of the risk to "health and safety" caused by releasing rule-permitted amounts of radiation, even where specific circumstances ought raise warning flags. Likewise, if challengers must

---

[1] of a substantial amount of the environmental impact associated with the plant—has been completed. And the FES states that the operation of the facility at full power (subject to certain recommended modifications) is expected to have a small impact on the environment.

"2. The Joint Intervenors' claim that licensing for less than 40 years should have been considered rests on an even shakier foundation. The Joint Intervenors apparently perceive some benefit inuring from a fresh review of the environmental impact prior to the expiration of the 40-year period, but they do not indicate what it would be. Moreover, they ignore the fact that licenses issued by the Commission are always subject to revocation or modification in light of subsequently developed data. And, with respect to certain environmental effects which were reviewed in this proceeding, the initial decision imposed a condition requiring the applicant to carry out a comprehensive operational monitoring program and, if certain significant and adverse effects are shown, to 'take corrective action to alleviate the impact'. In these circumstances, there was no warrant for the FES or the Board to consider, as an alternative, a license for less than 40 years. [Annotations omitted.]"

[1] 42 U.S.C. § 2232 sets forth the requirements for license applications under the Atomic Energy Act, and includes thereunder, " . . . such [] information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public."

The majority's view of the relationship between the rules and regulations and the sufficiency of findings based upon such rules and regulations is evident, 173 U.S.App.D.C. p. ——, 524 F.2d p. 1297: "The Commission had before it adequate information to demonstrate not only that approval of the operating license would meet technical and public policy standards engrained in its basic regulations but to permit its consideration and determination whether special circumstances pertained to the particular facility which might render these standards inadequate to afford reasonable assurances concerning public health and safety." The Court says further, " . . . it would be pointless, and a waste of agency resources, to require the AEC to reapply efforts that have already gone into its basic health and safety regulations, in individual licensing proceeding, in the absence of some evidence that a particular facility presents risks outside the parameters of the original rule making." Id. 173 U.S.App.D.C. at ——, 524 F.2d at 1299.

[2] The Court says: " . . . the reasoning of the Appeal Board constituted a principled decision on the point . . . ." and quotes the Board's opinion. Id. 173 U.S.App.D.C. at ——, 524 F.2d at 1301. The Board points out that there exist an infinite array of combinations of 'alternatives' requiring a percentage of full-power and a time period under forty years. It suggests that in light of this, "it is sufficient that the FES focus upon those alternatives which there is reason to believe might, if adopted provide a significant difference in environmental impact." Id. 173 U.S.App.D.C. at ——, 524 F.2d at 1301. The Board is favorably cited by the Court when it indicates, " . . . licenses issued by the Commission are always subject to revocation and modification in light of subsequently developed data. And, with respect to certain environmental effects which were reviewed in this proceeding, the initial decision imposed a condition requiring the applicant to carry out a comprehensive operational monitoring program and, if certain significant and adverse effects are shown, to take corrective action to alleviate the impact. In these circumstances, there was no warrant for the FES or the Board to consider, as an alternative, a license for less than 40 years." Id.

produce staggering quantums of evidence merely to raise the question of license suspension, ongoing activities will very rarely be re-examined. My specific concern is that public interest groups and others opposed to operation may not be able to finance a sufficient effort to uncover risks, harms or "significant and adverse effects." As I recently said,

> . . . to require of impecunious associations or private citizens a quantum of evidence beyond their financial means to marshal, as prerequisite to examining the rule or its controlling effect, is to blunt the tools with which bad or outdated rules are discarded or limited.

*American Public Power Association v. FPC*, 173 U.S.App.D.C. ——, 522 F.2d 142 (1975) (Bazelon, C. J., concurring).

In the instant case, the Court correctly notes that prejudice does not result from the somewhat wooden application of licensing regulations, because there was a full ventilation of known risks and benefits in the environmental phase of the hearings. There is a distinction between a testing of the "health and safety" risks in releasing a rule-permitted amount of radiation, and a weighing and balancing of those risks and others which may exist in a particular facility against the benefits of operating such a plant. Nonetheless, I am satisfied that in conducting such a risk-benefit analysis, the agency did assess residual radiological effects, and found them not "to endanger" or be "inimical to" public health and safety.[3] Thus, we are not faced with a failure to make the requisite findings, but with the argument that they were not made in the "proper" portion of the inquiry. The chief value of procedural strictness is that it maximizes critical examination of vital concerns; however, I fail to see how any lapse of formalism here weakened the validity of the findings rendered, or prejudiced petitioners in any way.

This case raises for me several lurking problems of untested technology and protection of the public against risk. Here that concern is presented in a highly rarefied form: there is essentially no dispute over the amount of radiation to be released to the environment by the Maine Yankee Atomic Power Station. Nor is there pitched battle over the low risk factor presently assigned to the release of such amounts. Science believes that it can quantify and understand the danger posed to organisms and the environment by those undisputed levels. The risk at issue herein is the risk that such present scientific knowledge is simply wrong or blind in such degree that after the passage of time and further study, the danger to society will be seen as greater than expected by orders of magnitude. Said differently, the twin risks are that either science is ignorant of entire categories of harm, or that rule-permitted quantities of radiation do the type of damage they are thought to, but to a far greater extent, or in a cumulative fashion with other factors so as to render difference in degree a difference in kind. These risks are hardest to calculate because they surpass the problems posed by mere ignorance of a new technology. The scientists and decision-makers are asked to assess and make allowance for the probabilities that present scientific understanding is itself terribly wrong.

Having posed such complex and conceptual questions, it would be foolhardy to proffer ironclad solutions. Petitioners assert that among the alternatives which NEPA bids the licensing agency consider are license periods shorter than the maximum statutory period of forty years.[4] While the statute does not mandate forty year license periods it gives the Commission the power to so mandate.[5]

---

**3.** For the source and applicability of these tests, see 173 U.S.App.D.C. at ——, 524 F.2d at 1298 n. 12.

**4.** Brief for Petitioners, 60–62.

**5.** 42 U.S.C. § 2133(c) provides:

Each such license shall be issued for a specified period, as determined by the Commission, depending on the type of activity to

Without foreclosing the argument that in extreme or emergency circumstances (with attendant risks even higher than those now understood to obtain in the nuclear field) such an approach is required, I cannot disagree with the Court. Nor can I say that the balance struck by Congress in legislating agency authority to license for that period has been repealed *sub silentio* by NEPA.

A far better course, perhaps, would be to utilize procedures for license suspension[6] upon a showing of reason to believe that the risk of harm caused by operation of the plant exceeds those expected levels upon which the license was premised. Similarly, suspension would be an avenue available where changes in scientific perception would later regard as deleterious levels of nuclear effluent or radiation release now thought to be harmless. Lines of inquiry and challenge would thus be kept open. My specific concern about imposing an unreasonable standard for raising the question

of looking beyond the rule is particularly salient in the area of license suspensions. It is more difficult by far to shut down an operating facility, which may involve cutbacks of service to present consumers, than to block or modify a proposed facility.

If society is to rely upon the suspension mechanism for protection against the risk of gross errors in scientific understanding, it must not only insure that the threshold for inquiry is reasonable, but also assist the objectors to state their case. For example, the Federal Trade Commission Improvement Act of 1974,[7] expressly grants to the FTC authority to reimburse intervenors' expenses in the interest that rulemaking serve the broadest possible public interest. An alternative to such direct public funding might be a university consortium, in which professors and students offset the financial burdens of fact-gathering and agency appearances by conducting public seminars or publishing their research.

be licensed, but not exceeding forty years, and may be renewed upon the expiration of such period.

6. *See* 42 U.S.C. §§ 2236, 2237.

7. Pub.L. No. 93–637, Title II, § 202(a), 88 Stat. 2193, codified as 15 U.S.C. § 57a(h), which reads in full:

Compensation for attorney fees, expert witness fees, etc., incurred by persons in rulemaking proceedings; aggregate amount payable in any fiscal year.

(h)(1) The Commission may, pursuant to rules prescribed by it, provide compensation for reasonable attorneys fees, expert witness fees, and other costs of participating in a rulemaking proceeding under this section to any person (A) who has, or represents, an interest (i) which would not otherwise be adequately represented in such proceeding, and (ii) representation of which is necessary

for a fair determination of the rulemaking proceeding taken as a whole, and (B) who is unable effectively to participate in such proceeding because such person cannot afford to pay costs of making oral presentations, conducting cross-examination, and making rebuttal submissions in such proceeding.

(2) The aggregate amount of compensation paid under this subsection in any fiscal year to all persons who, in rulemaking proceedings in which they receive compensation, are persons who either (a) would be regulated by the proposed rule, or (B) represent persons who would be so regulated, may not exceed 25 percent of the aggregate amount paid as compensation under this subsection to all persons in such fiscal year.

(3) The aggregate amount of compensation paid to all persons in any fiscal year under this subsection may not exceed $1,000,000.